**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kristen Burnham, individually and as representative of the estate of Caroline Burnham,<br><br>                    Plaintiff,<br><br>vs.<br><br>United States of America,<br><br>                    Defendant. | No. CV07-8017-PCT-DGC<br><br>**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER** |

The Court held a bench trial on September 13-14, 2011. On the basis of the evidence presented during trial, the Court enters the following findings of fact and conclusions of law.

**A.     Stipulated Facts.**

The parties have stipulated to the following facts:

1.     On May 29, 2005, Senior Chief Petty Officer Richard Alan Young ("Chief Young") and Caroline Burnham were involved in an automobile accident on Highway 95, at milepost 37.7, north of Yuma, Arizona.

2.     At the time of the accident, Chief Young was acting in the course and scope of his employment with the United States Navy.

3.     Caroline Burnham was driving a 1967 Volkswagen Beetle owned by Parrish Jackson. Chief Young was driving a 2005 Chevrolet Monte Carlo which he had rented for official government travel.

4.     Caroline Burnham died from injuries sustained in the accident.

5. Plaintiff Kristen Burnham was appointed as guardian for Ethan Mayne, Caroline Burnham's minor son, and retains that guardianship.

6. Plaintiff filed a timely administrative claim on May 7, 2007 for the wrongful death of Caroline Burnham in the amount of $5,000,000. The claim was denied on November 1, 2007.

7. Plaintiff filed this action against Chief Young on May 23, 2007, and amended her complaint to include the United States as a party on November 8, 2007. The United States was dismissed in December 2008, but that ruling was reversed on appeal and the United States has been substituted for Chief Young.

8. Myron Burnham, Caroline Burnham's father, previously identified as a statutory beneficiary in this action, is now deceased.

**B.  Findings of Fact.**

The Court makes the following findings of fact based on evidence presented at the trial. This evidence included the testimony of lay and expert witnesses and, most helpfully, 77 detailed photographs taken at the scene by an Arizona Department of Public Safety ("DPS") officer and admitted in evidence as Exhibit 102.[1]

1. There were no witnesses to the accident. Caroline Burnham died at the scene; Chief Young was knocked unconscious and has no memory of the accident. All conclusions regarding the collision must be drawn from circumstantial evidence.

2. Chief Young was proceeding southbound on Highway 95 at the time of the accident. Caroline Burnham left Yuma shortly before the accident to return to her home

---

[1] Plaintiff was required to present her case without the aid of an expert witness because Plaintiff failed to disclose an expert report by the Court's deadline, even after the deadline had been extended. *See* Doc. 118, pages 8-10. During trial, the Court also held that Defendant's expert witness could not provide opinions beyond his very brief expert report marked as Exhibit 105. The Court sustained Plaintiff's objections to opinions beyond the scope of that limited report. A more complete expert presentation could have occurred if both sides had followed the Court's expert disclosure requirements as set forth in the initial Case Management Order. Doc. 39. As the following factual findings make clear, however, the Court bases its findings on the circumstantial evidence at the scene as reflected in the detailed photographs (Ex. 102), and likely would have done so regardless of the extent of expert testimony.

in Kingman, Arizona, a drive north on Highway 95.

3. The day was clear, the roads were dry, the accident occurred at about 1:00 p.m., and both automobiles appear to have been in good working condition.

4. A DPS dispatcher broadcasted a report of a two-vehicle collision with a possible fatality at 1:08 p.m. Ex. 101. DPS Officer George Luna responded to the call and arrived at the scene at approximately 1:20 p.m. *Id.* DPS Officer Simpson assisted in the investigation and took the photographs admitted in evidence as Exhibit 102.

5. Following the accident, the Volkswagen came to rest off the shoulder of the northbound lane, facing east, on the bottom of a hill that sloped upward from west to east.

6. The Monte Carlo came to rest approximately 80 feet south of the Volkswagen (Ex. 101, page 6), on the shoulder of the northbound lane, facing northeast.

7. Damage to the Volkswagen, as reflected in photographs 02081 and 02082, clearly suggests that the Monte Carlo hit the Volkswagen at approximately a 45 degree angle on the left front tire and left driver's side door.[2] This angle of impact can be seen in the deep impression left in the body and frame of the Volkswagen and is consistent with damage to the left front portion of the Monte Carlo as reflected in photographs 02110 and 02111.

8. Before coming to rest, the Monte Carlo rolled, as shown by damage to its roof and sides seen in photographs 02106, 02109, and others.

9. As the Monte Carlo rolled, it was traveling in a southeasterly directly. This fact is demonstrated not only by the orientation of the vehicle after it came to rest following the roll, but also from the glass deposited on the road from its side window, rear windscreen, and windshield, as reflected in photographs 02096, 02097, and 02099.

10. As the Monte Carlo rolled, it also left a gouge mark in the road. Officer Luna testified credibly on the basis of his training and experience that fresh gouge marks

---

[2] The photographs in Exhibit 102 are labeled with numbers such as "DSC 02081.jpg." The Court will shorten these to just the numeric numbers – 02081.

- 3 -

made by an accident are light in color. The gouge mark left by the Monte Carlo as it rolled appears as a light colored mark seen in the immediate foreground of the glass in photographs 02094 and 02096.

11. If the path of the Monte Carlo's roll is traced backward over the glass and the gouge mark in the road, as can be done with photograph 02096, it is evident that the path of the rolling vehicle, when reversed, would take it back over the northbound lane and into the center of the road between the northbound and southbound lanes. Thus, it appears that the roll began when the vehicle was located between the two lanes.

12. This point in the middle of the lanes includes a yaw mark made by a tire. The yaw mark was identified by Officer Luna at the scene and appears on the west side of the middle yellow stripe of the road as a curved dark line arcing from a southerly direction to a southeasterly direction. The mark can be seen most clearly in photograph 02095, and also is visible in photographs such as 02058, 02059, 02060, and 02091.

13. The yaw mark arcs toward the gouge mark and broken glass left in place when the Monte Carlo rolled and where the Monte Carlo came to rest on the northbound shoulder of the road. *See* 02058, 02059, 02060, and 02091.

14. Thus, it appears the Monte Carlo began to rotate counterclockwise and to roll at approximately the location of the yaw mark, and continued to roll over the area in the road where the gouge mark and glass are deposited, to its final resting place. Photograph 02096 is taken from a point just east of the yaw mark and shows the path of the roll.

15. Other dark marks in the road are consistent with this direction of travel, such as the mark seen in photographs 02094 and 02096.

16. The direction of the Monte Carlo's roll from the center of the road suggests that the collision between the Monte Carlo and the Volkswagen occurred approximately at the center line of the road between the southbound and northbound lanes. It appears the Monte Carlo was traveling south and, as a result of the collision, veered to the left

(creating the yaw mark that arcs from south to southeast), rolled in a southeasterly direction (making the gouge mark and depositing the glass on the road), and came to rest on the shoulder of the northbound lane facing northeast. *See* 02096, 02098, 02099.

17. With the collision point occurring in the middle of the road, near the center stripe, the angle of impact becomes very important. As previously noted, the Monte Carlo impacted the Volkswagen at approximately a 45 degree angle on the left front side of the Volkswagen. For the Monte Carlo to impact the Volkswagen at such an angle in the middle of the road, with the Monte Carlo traveling south consistent with the yaw mark, the Volkswagen must have been pointing to the northeast at the time of the collision. This could have happened only if the Volkswagen was traveling from the southbound lane to the northbound lane in a northeasterly direction when the collision occurred. A collision between the Monte Carlo and the Volkswagen in the center of the road, with the Volkswagen pointing toward the northeast, would have resulted in the 45 degree angle of impact on the left front side of the Volkswagen, would have caused the Monte Carlo to begin turning counter-clockwise (from the force hitting its left front corner), creating the yaw mark and leading to the rolling of the Monte Carlo toward the southeast where the gouge mark and glass are deposited and the Monte Carlo came to rest. *See* 02096, 02098, 02099. The blow from the Monte Carlo to the Volkswagen would have caused the Volkswagen either to deflect directly into the hillside on the east side of the road or to spin as it traveled in an easterly direction to its final resting place on the hill to the east side of the road. *See* 02101.

18. The Volkswagen could have been traveling from the southbound to the northbound lane, in a northeasterly direction, only in three possible scenarios which were described at trial. First (and most likely in the Court's view), Ms. Burnham could have been travelling north in the northbound lane, drifted unintentionally into the southbound lane, realized her error, and corrected by turning to the right toward the northbound lane, resulting in the collision with the Monte Carlo as the Volkswagen was pointed northeast

in the approximate mid-point of the road.  Second (and less likely given her general direction of travel to the north), Ms. Burnham could have been facing south on the shoulder of the southbound lane and could have made a U-turn across the southbound lane to head north, leading to the collision with the Monte Carlo as the U-turn was nearly completed and the Volkswagen was facing in a northeasterly direction at the mid-point of the road.  This is Officer Luna's theory of how the accident occurred.  *See* Ex. 101.  Third, the Volkswagen could have pulled from the northbound lane over onto the shoulder of the southbound lane, and then could have attempted to return to the northbound lane by driving diagonally across the southbound lane, leading to the collision at the mid-point of the road.  Under any of these scenarios, Ms. Burnham would have been at fault rather than Chief Young.

19. Another possible scenario for the accident was that Ms. Burnham could have been traveling north in the northbound lane when Chief Young drifted across the center line and struck her vehicle in the left front section.  Such a collision would not be entirely inconsistent with the physical evidence at the scene, but it would have required the Monte Carlo to be traveling to the southeast at a 45 degree angle – a rather sharp angle for a vehicle traveling 50 or 55 miles per hour from the southbound lane – and it likely would have caused the Monte Carlo to continue farther off the road than its final resting place on the shoulder of the northbound lane.  Such a collision also would not leave the yaw mark, the gouge, and the glass in their locations in the photographs.  *See* 02096, 02097, 02098.  It also would appear that the Volkswagen travelling north at the point of impact would have travelled farther north than its final resting place almost due east of the primary area of accident debris.  *See* 02081, 02101.  The Court thus finds this scenario less likely than the three described above.

20. Another possible explanation, which would not require the Monte Carlo to be traveling to the southeast at a 45 degree angle, is that Chief Young drifted across the center line toward Ms. Burnham, she instinctively swerved to the right in order to avoid

the collision, and Chief Young's vehicle impacted her Volkswagen at a 45 degree angle as his vehicle was traveling south-southeasterly and her vehicle was traveling north-northeasterly. This scenario is not entirely inconsistent with the physical evidence at the scene, but it appears logical that such a collision also would have resulted in the Volkswagen coming to rest farther north from the debris field than it in fact did. As noted above, the photographs show that the Volkswagen came to rest almost directly east of the debris field. *See* 02081, 02101. In addition, such a collision would have occurred near the right side of the northbound lane, a location from which the Monte Carlo could not have left the yaw mark, gouge mark, and glass deposits in the locations seen in the photographs. *See* 02091, 02094, 02095, 02096. Thus, this scenario also appears less likely than the three described above.

21. The Court readily concedes that the precise nature of the accident cannot be determined with certainty from the physical evidence. For the reasons described above, however, it appears more likely that the accident occurred between the two lanes, with the Monte Carlo facing south and the Volkswagen facing northeast – meaning that the Volkswagen was traveling from the southbound lane to the northbound lane. Such a scenario would be consistent with Ms. Burnham's fault rather than Chief Young's fault.

22. The Court found Officer Luna to be a credible witness. The Court accepts as true his description of physical findings at the site, particularly including the location and recent deposit of the yaw mark that is a critical piece of evidence in this case.

23. The Court did not find Defendant's expert, Toby Gloekler, particularly persuasive. Mr. Gloekler appeared unwilling to concede even the smallest of points, arguing as an advocate on every issue. The Court agrees with Mr. Gloekler's conclusion that the vehicles collided at a 45 degree angle, but this fact appears quite obviously from the photographs of the Volkswagen (02081, 02082) and the Monte Carlo (02110, 02111).

24. The Court does not find credible Delmar Foote's hypothesis that a gouge in the road reflects the fact that the Volkswagen was traveling due north at the time of the

impact. The gouge could not be identified in any of the 77 photographs taken at the scene, and Officer Luna, who inspected the scene with some care, did not see the gouge. Moreover, the Court concludes that a 45 degree impact between the 3,400 pound Monte Carlo and the 1,700 pound Volkswagen would not have resulted in the Volkswagen continuing to travel in a straight line due north, leaving a straight gouge in the road after its left front wheel had been severed. The force of the impact would have moved the Volkswagen to the right, producing a northeasterly or curved gouge if a gouge was in fact made by the I-beam as Mr. Foote concluded.

25. Nor does the Court find Mr. Foote's testimony regarding the oil spill to be credible. The oil spill is not visible in any of the photographs taken at the scene, and Officer Luna explained that any oil on the asphalt would have been cleaned up before the site was reopened in order to avoid a safety hazard. As a result, oil at the scene would have been cleaned up before Mr. Foote visited the scene the next day. Although it appears that the oil pan of the Volkswagen was indeed fractured during the collision as Mr. Foote testified, at least some of the oil appears to have spilled into the dirt behind and under the Volkswagen after it came to rest as reflected in photographs 02076, 02085, and 02115.

26. The Court does not find credible Mr. Foote's assertion that asphalt seen on the I-beam of the Volkswagen in the wrecking yard necessarily means that it created a gouge in the road at the time of the accident. This clearly was a violent accident, during which the left front wheel of the Volkswagen was severed from the vehicle. Such a severance likely would have resulted in the vehicle coming to rest on the I-beam, causing it to be ground down and to acquire asphalt regardless of the direction in which the car was turning or traveling after impact. Moreover, Officer Luna testified that the Volkswagen would have been dragged onto the back of a tow truck with a cable after the accident, further causing the I-beam to drag across the dirt and asphalt before being hauled to the wrecking yard.

27. The Court notes that it does not find Mr. Foote's conclusions to be lacking credibility because Mr. Foote lacks credibility. The Court found him to be a sincere and honest witness. Given the circumstantial evidence of the scene, however, the Court concludes that some of his conclusions were mistaken, even though honestly arrived at.

28. The Court does not find credible Plaintiff's assertion that the green and blue glass in the roadway came from the Volkswagen. A careful examination of the photographs shows that the bluish glass appears to be the same color as the glass in the left rear passenger window of the Monte Carlo, as reflected in photograph 02105. Moreover, if one were to roll the Monte Carlo back along its path of travel as shown in this photograph, the left rear passenger window would appear to pass over the precise location where the blue glass is shown in photograph 02105, suggesting that the glass was deposited in the road as the Monte Carlo rolled and the left rear passenger window shattered.

29. The green glass in the road, as reflected in photograph 02102, appears to be consistent with the green glass in the windshield of the Monte Carlo as reflected in photographs 02105, 02106, 02107, and 02108. It also appears to be consistent with the glass around the edge of the rear windscreen as seen in photograph 02109.

30. If the Monte Carlo were to be rolled in reverse, back toward the direction where the accident occurred, it appears that the green glass in the road would have been deposited by the partial fracture of the windshield (as shown in 02110 and 02111) and the complete fracture of the rear windscreen (as shown in 02109). Thus, it appears that these windows shattered as the vehicle was rolling toward the location of its final resting place. It further appears that the vehicle was sliding as it rolled, resulting in the scraping on the vehicle seen in photograph 02106, accounting for the distance between the location of the green glass deposited from the shattering of the windshield and the blue glass deposited by the shattering of the left rear passenger window. *See* 02096, 02097, 02098.

31. That none of this glass came from the Volkswagen is apparent from the fact

that the windshield of the Volkswagen can be seen on the front of the Volkswagen in photographs 02079 through 02082. Moreover, the Court found credible Mr. Gloekler's assertion that the glass from the rear windscreen of the Volkswagen, as well as the rubber frame that held it in place, can be seen in front of the Volkswagen as reflected in the lower right-hand corner of photograph 02080 (lower right hand corner) and to the upper left of the Volkswagen in photograph 02085.

32. As a result, the Court does not find credible Plaintiff's assertion that the green and blue glass in the roadway was left by the Volkswagen at the point of impact between the vehicles. Rather, the green and blue glass in the roadway clearly appears to have been deposited by the Monte Carlo as it rolled in a southeasterly direction following the collision in the middle of the road as reflected in photographs 02096 and 02097.

33. Again, the direction of roll of the Monte Carlo – as indicated by the final resting place and orientation of the Monte Carlo, the glass it deposited during the roll, the gouge in the road, and the yaw mark in the road – suggests that the accident occurred between the southbound and northbound lanes with the Monte Carlo travelling south (consistent with the start of the yaw mark – 02095) and the Volkswagen pointing in a northeastern direction, traveling from the southbound lane to the northbound lane.[3]

34. Mr. Foote testified credibly that he found small parts of the Volkswagen in the grass off the shoulder of the northbound lane some distance north of the Volkswagen's final resting place. The Court finds this fact to be consistent with the first (and most likely) scenario discussed above – the Volkswagen travelling northeasterly at a high rate of speed when the collision occurred, causing these parts to fly northeasterly to the location where Mr. Foote found them. The Court notes that a fender of the Volkswagen came to rest in a similar location. *See* 02067.

---

[3] The fact that the Monte Carlo was travelling south in the middle of the road would appear to be consistent with the fact that the Volkswagen was in the northbound lane before the collision, causing Chief Young to move to his left in an attempt to avoid the collision.

- 10 -

35. In summary, although the nature of the collision cannot be determined with certainty, a preponderance of the evidence suggests that the accident occurred in a manner consistent with Ms. Burnham's fault rather than Chief Young's fault.

**C.  Conclusions of Law.**

1. Plaintiff has failed to satisfy her burden of proving that the accident was caused by the fault of Chief Young. As a result, Plaintiff has not shown that Chief Young breached a duty of care or that his breach caused Plaintiff's injuries.

2. The Court accordingly will enter judgment in favor of Defendant United States of America.

**IT IS ORDERED:**

1. The Court finds in favor of Defendant United States of America on the merits in this case.

2. The Clerk is directed to enter judgment in favor of Defendant and terminate this action.

Dated this 19th day of September, 2011.

_____
David G. Campbell
United States District Judge